Becker v. State



COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS






GEORGE BERTRAM MATHISON, IV,


 Appellant,


v.


THE STATE OF TEXAS,


 Appellee.
§


 


§


 


§


 


§


 


§


 


 § 




No. 08-10-00098-CR


Appeal from the


396th Judicial District Court

of Tarrant County, Texas

 

(TC# 1093066D)





O P I N I O N


 George Bertram Mathison, IV, was charged with theft of property valued between
$100,000 and $200,000. Pursuant to a plea agreement, he pled guilty to theft of property valued
between $20,000 and $100,000, and the State recommended that he receive deferred adjudication
and pay restitution in an amount to be determined by the trial court. In accordance with the plea
agreement, the court deferred the adjudication of guilt and placed Mathison on community
supervision for ten (10) years. The court subsequently conducted an evidentiary hearing and
ordered Mathison to pay $193,700 in restitution as a condition of community supervision. 
Mathison raises six issues on appeal. We affirm. (1)

Factual Basis for Amount of Restitution

 In his second issue, Mathison asserts that the amount of restitution is not supported by the
record. We review this issue for an abuse of discretion. Nunez v. State, 27 S.W.3d 210, 216
(Tex.App.--El Paso 2000, no pet.). We will uphold the restitution order if it is just and if there is
a factual basis in the record for the amount found by the trial court. See id. at 216-17.

 The record reflects that Jon Aubrey was the president and founder of a corporation called
Bentwater Construction. He owned all of the corporation's shares. Mathison was a vice-president of Bentwater. Aubrey testified that Mathison was paid a weekly salary and was entitled
to a commission based on profitable work that he brought into the corporation. According to
Aubrey, Mathison never earned a commission because none of his projects were profitable. 
Aubrey testified that he provided the prosecution with copies of Mathison's expense accounts,
which would show instances in which Mathison paid for items such as software and was
reimbursed from corporate funds. He also provided the prosecution with copies of "1099s" for
all of Bentwater's employees. Defense counsel questioned Aubrey about funds that Aubrey had
withdrawn from Bentwater's bank account, suggesting that these were illicit transactions. 

 Phillip Morris, a forensic financial analyst for Tarrant County, testified that he reviewed 
bank account transactions for Mathison's personal bank account and for Bentwater's account. 
He prepared charts showing unauthorized withdrawals that Mathison made from Bentwater's
account in 2003 and 2004. One of the charts showed a total of $193,700 in withdrawals. Morris
testified that most of these funds were deposited into Mathison's personal account on the day
they were withdrawn or soon thereafter. To support his testimony, Morris prepared a spreadsheet
correlating the withdrawals with deposits into Mathison's bank account. For example, the
spreadsheet showed that on August 30, 2004, Mathison withdrew $60,000 to purchase a cashier's
check made out to himself for the purpose of "Mathison Earned Income/Commission." That
same day, he deposited $60,000 into his personal account. On August 6, 2004, he withdrew
$9,700 from Bentwater's account, noting "Re: Aubry Trans" on the withdrawal slip. That same
day, he deposited $9,300 into his personal account. Morris testified, without objection, that
Aubrey told him that all of the withdrawals reflected in this chart and spreadsheet were made
without consent. He also reviewed Mathison's W-2 forms and Texas Workforce Commission
records to determine Mathison's reported compensation. He did not include any of the reported
compensation in the $193,700 total. Morris specifically testified that he did not find any 1099s
to indicate that the $60,000 withdrawal for "earned income/commission" constituted legitimate
compensation. Aubrey testified that there was no 1099 for this amount. Morris deduced that
notations such as "earned income/commission" and "Re: Aubry Trans" were simply attempts to
cover-up the fact that Mathison was stealing money.

 On cross-examination, Morris testified that he did not know that Aubrey had taken money
out of Bentwater's account for his personal benefit, nor did he know that Aubrey asked Mathison
to make certain withdrawals for Aubrey's benefit. Based on Mathison's position within the
company, Morris indicated that he may have been authorized to purchase software and office
supplies and to pay vendors. But Morris did not review any documentation regarding these types
of transactions. Both Morris and Aubrey acknowledged that Mathison had authority to withdraw
funds from the bank.

 Mathison testified that he and Aubrey agreed that he would not take a salary, but would
be paid a commission based on projects that he brought to the company. According to Mathison,
Bentwater was in financial disarray when he joined the company, and Aubrey was "notorious"
for coming up with reasons not to pay people. He claimed that he earned over $202,000 in
commissions, that he had the authority to pay himself, and that he did pay himself. He also
claimed that on numerous occasions, he withdrew corporate funds to buy cashier's checks to
make corporate purchases as a result of Bentwater's bad credit. Mathison admitted that he did
not receive a 1099 for the $60,000 withdrawal and that he did not report it or the other funds that
he withdrew on his tax return. He acknowledged that he had pled guilty to stealing from Aubrey
and that he owed him "a little bit" of money. Nevertheless, he testified that the "whole premise"
of his prosecution was to provide a defense for Aubrey in a civil suit. Aubrey and Bentwater had
been sued for their failure to pay subcontractors on a project. Aubrey filed a third-party claim in
that suit against Mathison, claiming Mathison's embezzlement led to the nonpayment. Mathison
testified that Aubrey needed "a solid verdict against [Mathison] in order to protect himself from
this lawsuit."

 Mathison complains on appeal that the trial court erroneously assumed from Morris's
testimony that $193,700 in withdrawals were unauthorized, even though Aubrey never testified
to the precise amount of the unauthorized withdrawals. The lack of testimony from Aubrey is
immaterial because Morris testified that, based on his conversation with Aubrey, the entire
$193,700 amount was unauthorized. Mathison also contends that the trial court failed to
consider what Aubrey owed Mathison for his services to Bentwater. We believe the court simply
resolved a credibility issue against Mathison. Aubrey testified that Mathison was paid a salary
and that he never actually earned a commission. Morris testified that the $193,700 sum excluded
Mathison's salary. We conclude that there is an ample factual basis for the amount of restitution
awarded and that the amount is just.

 Mathison's second issue is overruled.

Oral Pronouncement of Amount of Restitution

 In his first issue, Mathison asserts that the restitution order must be vacated because the
trial court did not orally pronounce the amount of restitution. The Texas Code of Criminal
Procedure states that "sentence shall be pronounced in the defendant's presence." Tex.Code
Crim.Proc.Ann. art. 42.03, § 1(a)(West Supp. 2011). Based on this statute, the Court of
Criminal Appeals has held, "A defendant's sentence must be pronounced orally in his presence. 
The judgment, including the sentence assessed, is just the written declaration and embodiment of
that oral pronouncement. When there is a conflict between the oral pronouncement of sentence
and the sentence in the written judgment, the oral pronouncement controls." Taylor v. State, 131
S.W.3d 497, 500 (Tex.Crim.App. 2004)(footnotes omitted). Restitution is a form of punishment. 
Weir v. State, 278 S.W.3d 364, 366 & n.6 (Tex.Crim.App. 2009). Accordingly, restitution
cannot be included in the written judgment of conviction unless it was included in the oral
pronouncement of sentence. See Sauceda v. State, 309 S.W.3d 767, 769 (Tex.App.--Amarillo
2010, pet. ref'd); Alexander v. State, 301 S.W.3d 361, 363-64 (Tex.App.--Fort Worth 2009, no
pet.); cf. Taylor, 131 S.W.3d at 500-02 (holding that fine should be deleted from judgment
because it was not orally pronounced when deferred adjudication was revoked). 

 In this case, the following exchange occurred at the end of the restitution hearing:

 The Court: What I'd like to do is take everything under advisement,
look at all of the documents, and if I have any questions I'll
get back with counsel, otherwise I'll submit a written
finding.


 Defense Counsel: Yes, Your Honor.


 The Court: Is that agreeable with the State?


 Prosecutor: That's fine.


 Defense Counsel: Yes, Your Honor.


The court subsequently entered the written order requiring Mathison to pay $193,700 in
restitution. The court also entered a written judgment. Attached to the judgment is a document
entitled "Conditions of Community Supervision," which was signed by Mathison and which lists
the restitution order as a condition of community supervision. Mathison argues that there is a
conflict between the written judgment and the oral pronouncement of sentence because the court
did not orally state the amount of restitution.

 The cases that Mathison cites as support for his argument are distinguishable. In those
cases, the courts failed to include restitution in orally pronouncing sentence after the defendants
were convicted. See Sauceda, 309 S.W.3d at 769-70 (oral pronouncement following conviction
by jury); Alexander, 301 S.W.3d at 363-64 (oral pronouncement following revocation of deferred
adjudication community supervision); Weir v. State, 252 S.W.3d 85, 86-88 (Tex.App.--Austin
2008)(oral pronouncement following revocation of deferred adjudication community
supervision), rev'd in part on other grounds, 278 S.W.3d 364 (Tex.Crim.App. 2009). Here, the
trial court did not orally state the amount of restitution when placing Mathison on deferred
adjudication community supervision. Mathison was neither convicted nor sentenced when he
was placed on deferred adjudication. See Taylor, 131 S.W.3d at 500, 502. Restitution is simply
a condition of his community supervision. Therefore, it is not clear that the statutory requirement
of orally pronouncing sentence is applicable. See Tex.Code Crim.Proc.Ann. art. 42.03,
§ 1(a)("[S]entence shall be pronounced in the defendant's presence."); Speth v. State, 6 S.W.3d
530, 532 (Tex.Crim.App. 1999)("[C]ommunity supervision . . . is not part of the 'sentence,' as
. . . defined in the Code of Criminal Procedure.").

 Assuming the requirement applies, we agree with the State that Mathison failed to
preserve any error. See Tex.R.App.P. 33.1(a)(1). The trial judge advised counsel that he
intended to make a written finding regarding restitution, and both attorneys acquiesced to this
procedure. See Lemos v. State, 27 S.W.3d 42, 47 (Tex.App.--San Antonio 2000, pet.
ref'd)(holding that appellant's complaints about specific items of restitution were not preserved
because he acquiesced to the items). Moreover, Mathison did not file a motion for new trial or
otherwise object when the court entered the written restitution order and the written conditions of
community supervision. The Court of Criminal Appeals has noted that community supervision is
not a right, but a contractual privilege and "by entering into the contractual relationship without
objection, a defendant affirmatively waives any rights encroached upon by the terms of the
contract." Speth, 6 S.W.3d at 534. A defendant who benefits from this privilege must complain
to the trial court of any conditions that he finds objectionable. Id.

 Mathison's first issue is overruled.

Due Process

 In his third issue, Mathison asserts that he did not have notice that he could be ordered to
pay more than $100,000 in restitution when he pled guilty to theft of property valued between
$20,000 and $100,000. Therefore, he contends, his right to due process was violated. 

 As Mathison acknowledges, the property-value range for the offense does not limit the
amount of restitution that may be awarded for a theft conviction. See Campbell v. State, 5
S.W.3d 693, 697, 701 (Tex.Crim.App. 1999). However, there are due process considerations in
setting the restitution amount. See id. at 696, 701-02.

 In Campbell, the appellant was ordered to pay $100,000 in restitution after he was
charged with, and pled no-contest to, theft of property valued at $20,000 or more but less than
$100,000. Id. at 695. He argued that his plea was involuntary because he did not realize that he
was subject to pay restitution in an amount that exceeded the property-value range set forth in the
indictment. See id. at 701. The Court of Criminal Appeals rejected this claim. Id. at 701-02. 
Although the trial court did not admonish the appellant about restitution at the plea hearing, the
appellant and his attorney signed a written plea form, which requested that the trial court grant
deferred adjudication "with conditions to include restitution to all victims of this scheme,
whether pled in the indictment or not." Id. The appellant also stipulated that he stole more than
$100,000 from the victims. Id. at 702. Accordingly, the Court of Criminal Appeals concluded
that he must have understood that he was asking for a restitution order that exceeded the
property-value range for the offense. Campbell, 5 S.W.3d at 702.

 Unlike in Campbell, Mathison did not stipulate that he stole more than $100,000, and he
claims that he did not understand that he could be ordered to pay more than that amount. As with
Mathison's first issue, Mathison failed to raise this issue in the trial court. Consequently, it is not
preserved for review. See Tex.R.App.P. 33.1(a)(1); see also Briggs v. State, 789 S.W.2d 918,
924 (Tex.Crim.App. 1990)("Even constitutional errors may be waived by failure to object at
trial."); cf. Issa v. State, 826 S.W.2d 159, 161 (Tex.Crim.App. 1992)(holding that appellant
preserved issued by including it in a motion for new trial, because he had no opportunity to
object until after the complained-of action was taken).

 In addition, Mathison has not presented a sufficient record for us to resolve his due
process complaint. Although his appellate brief, which was written by counsel, states that
Mathison did not understand that restitution could exceed $100,000, there is no evidence to that
effect in the record. It was Mathison's burden to provide a sufficient record to demonstrate error. 
Word v. State, 206 S.W.3d 646, 651-52 (Tex.Crim.App. 2006).

 Mathison's third issue is overruled.

Ineffective Assistance of Counsel

 In his fourth and fifth issues, Mathison asserts that his attorney was ineffective in failing
to make a closing argument and in failing to object to the lack of an oral pronouncement of the
amount of restitution. He argues that these failures rendered his plea involuntary and resulted in
an excessive restitution order.

 To prevail on his claim of ineffective assistance of counsel, Mathison must show that his
attorney's representation fell below an objective standard of reasonableness and that there is a
reasonable probability that the result of the proceeding would have been different if not for
counsel's errors. Strickland v. Washington, 466 U.S. 668, 687-88, 694, 104 S.Ct. 2052, 2064,
2068, 80 L.Ed.2d 674 (1984); Lopez v. State, 343 S.W.3d 137, 142 (Tex.Crim.App. 2011). In
evaluating counsel's performance, we must presume that it fell within the wide range of
reasonably professional assistance. Lopez, 343 S.W.3d at 142. Any deficiency must be
affirmatively demonstrated in the trial record; we cannot engage in retrospective speculation. Id. 
If the record does not reveal counsel's reasons for the challenged conduct, we must "assume that
counsel had a strategy if any reasonably sound strategic motivation can be imagined." Id. at 143. 
The appellate record usually does not reveal counsel's reasons. Id. Therefore, the Court of
Criminal Appeals has repeatedly held that ineffective assistance claims should generally be
raised on collateral review rather than on direct appeal. Id. An ineffectiveness claim may be
addressed on direct appeal only "[i]n the rare case in which trial counsel's ineffectiveness is
apparent from the record." Id. "However, this is a difficult hurdle to overcome: the record must
demonstrate that counsel's performance fell below an objective standard of reasonableness as a
matter of law, and that no reasonable trial strategy could justify trial counsel's acts or omissions,
regardless of his or her subjective reasoning." Id.

 The record does not reveal why counsel failed to make a closing argument or failed to
object to the lack of an oral pronouncement. Mathison argues that there could be no sound
reason for these decisions. He asserts that counsel needed to summarize the evidence and present
a persuasive closing argument that only a minimal amount of restitution would be just. He also
asserts that the trial court would have been required to sustain an objection to the lack of an oral
pronouncement and that counsel would then have had a chance to respond to the amount found. 

 "[D]eference to counsel's tactical decisions in his closing presentation is particularly
important because of the broad range of legitimate defense strategy at that stage." Yarborough v.
Gentry, 540 U.S. 1, 6, 124 S.Ct. 1, 4, 157 L.Ed.2d 1 (2003). The Supreme Court has recognized
that "it might sometimes make sense to forgo closing argument altogether." Id. at 6, 124 S.Ct. at
4. Here, the prosecutor did not make a formal closing argument; he just asked the court to
review State's Exhibit 1 and make its decision based on the exhibit. That is when the judge
stated that he would like to take everything under advisement and would "get back with counsel"
if he had any questions. As discussed above, defense counsel did not voice any objection to this
procedure. State's Exhibit 1 contained the chart and spreadsheets described above. It also
contained other charts and spreadsheets showing a total of $311,628.11, which was the amount
the State sought in restitution. Defense counsel had already cross-examined Morris, who was the
only witness called by the State, about how he arrived at this amount. He had also called Aubrey
and Mathison as witnesses to discredit Morris's calculations and to show that the company was
poorly managed. It appears that defense counsel's strategy was not to suggest a particular
amount of restitution, but to achieve a small amount by creating confusion and doubt regarding
the State's computation. The actual amount ordered--$193,700--was significantly less than the
amount requested by the State.

 Considering these facts, we cannot say that defense counsel's failure to make a closing
argument was objectively unreasonable as a matter of law. Likewise, we can easily imagine a
sound strategy for failing to object to the oral pronouncement. Defense counsel may have
believed that if he pressed the judge for an immediate figure, the judge would have adopted the
total amount requested by the State.

 Mathison's fourth and fifth issues are overruled.

Modification of Judgment

 In his sixth and final issue, Mathison notes that the judgment incorrectly names the
offense as "theft of stolen property." In fact, he pled guilty to theft of property. The State agrees
that the judgment should be reformed in this respect. Mathison's sixth issue is sustained. 

Conclusion

 The judgment is modified to strike the word "stolen" from the description of the offense. 
In all other respects, the judgment is affirmed.




January 25, 2012

 CHRISTOPHER ANTCLIFF, Justice


Before McClure, C.J., Rivera, and Antcliff, JJ.


(Do Not Publish)
1. In the written plea agreement, Mathison states, "I give up and waive any and all rights of
appeal in this case." On the day that the plea agreement was signed, the trial court entered a
certification of defendant's right of appeal, stating that this is a plea-bargain case and Mathison has
no right of appeal, and also that Mathison waived the right to appeal. After the restitution order was
entered, Mathison filed a notice of appeal "specific to the amount of restitution." The trial court
subsequently entered a second certification of defendant's right of appeal, stating that Mathison had
received permission to appeal and that the appeal "involves another appealable order," namely, the
restitution order. The State does not challenge our authority to consider any of the issues raised in
this appeal. We express no opinion as to whether a plea-bargaining defendant may ordinarily appeal
a restitution order. But see Stretcher v. State, No. 06-08-00233-CR, 2009 WL 3672882, at *3
(Tex.App.--Texarkana Nov. 6, 2009, no pet.)(memo op., not designated for publication)("Stretcher
essentially argues that when he agreed to allow the trial court to set the amount of restitution, he did
not anticipate such a large amount. Since the parties entered a negotiated plea agreement and that
agreement specifically allowed the trial court to set the amount of restitution, which it did after
conducting an evidentiary hearing, we find that Stretcher does not meet the narrow grounds available
to appeal a negotiated plea agreement."). Because the certification states that the trial court granted
Mathison permission to appeal and does not expressly limit the grounds of appeal, we will address
all of the issues raised by Mathison, including his claim that his plea was involuntary. But see
Cooper v. State, 45 S.W.3d 77, 77 (Tex.Crim.App. 2001)(holding that a plea-bargaining defendant
may not appeal the voluntariness of the plea).